UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

            Plaintiff,                CRIMINAL NO. 10-20772

      v.                     DISTRICT JUDGE VICTORIA A. ROBERTS

SHAKEVIUS STEPHENS,        MAGISTRATE JUDGE MARK A. RANDON

            Defendant.

_____/

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS ORAL STATEMENTS (DKT. NO. 10)

### I. INTRODUCTION

Shakevius Stephens has been indicted on charges that she imported and possessed with intent to deliver thousands of pills containing the drug commonly known as "ecstasy."[1] (Dkt. No. 1) Presently before the Court is Stephens' motion to suppress the oral statements she made to agents from the Department of Homeland Security ("DHS") while detained at a United States border crossing. (Dkt. No. 10)  Stephens claims that her statements were: (1) made in response to an interrogation that was not preceded by *Miranda* warnings, (2) taken despite her repeated requests for an attorney and (3) coerced.  The motion was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. 636 (B)(1)(A) and has been fully briefed. (Dkt. Nos. 10, 15,

_____

[1] The chemical name for "ecstasy" is 3-4-methylenedioxymethamphetamine or MDMA. According to www.drugabuse.gov, it is a synthetic, pyschoactive drug with amphetamine-like and hallucinogenic properties.  Congress has classified 3-4-methylenedioxymethamphetamine as a Schedule I controlled substance. 21 U.S.C. § 812.

- 1 -

22, 25)  On April 12, 2011, a three and-a-half hour suppression hearing was held, during which

Stephens, and both of the DHS agents who interviewed her, testified before the undersigned, subject

to cross examination.  For the reasons indicated below, the undersigned specifically finds as follows:

1.     that the suppression hearing testimony of both Agent Weigman and Agent
       Helmerson was more credible than the testimony of Stephens;

2.     that, with the single exception of the question: "What were you going to do
       when you entered the U.S.?" (commonly asked of individuals seeking entry
       into the United States), Stephen's was mirandized *before* being interrogated
       by the DHS agents;

3.     that, under the circumstances presented, even if the single question asked of
       Stephens does not fall within the "booking exception" to *Miranda*, only
       Stephens' response to that question should be suppressed – not the post-
       *Miranda* statements, which based on the totality of the circumstances were
       knowingly and voluntarily made;

4.     that under the circumstances presented, Stephens' refusal to sign the waiver
       of rights form did not render her subsequent oral statements inadmissible; and

5.     that, because Stephens' arrest occurred at a United States border crossing,
       DHS agents were not required to obtain consent to search Stephen's cell
       phone, and their decision not to mirandize Stephens before requesting
       consent to search her phone did not render Stephens' subsequent oral
       statements inadmissible.

Therefore, **IT IS RECOMMENDED** that Stephens' motion to suppress be **DENIED**, *except for*

Stephens' response to the one question regarding what she was going to do once she entered the

United States.

## II.  FACTS

On June 29, 2010, while attempting to enter the United States from Canada, Stephens was

detained at the border by officers from the Bureau of Customs and Border Protection ("CBP") in

Detroit, Michigan. (Tr. 133-4)  Upon secondary inspection of Stephens' rented car, approximately

18,000 pills containing "ecstasy" were found secreted in the rear bumper. (Dkt. No. 25, Ex. A (SS 179)) Stephens, the vehicle's lone occupant, was advised that she was under arrest and placed in an on-site holding cell, pending the arrival of DHS agents. (Tr. 134)  CBP officers observed Stephens in the holding cell during each of the "15 minute Checks" from 4:40 p.m. to 5:25 p.m. (Dkt. No. 25, Ex. B. CBP Detention Log Sheet)  The CBP's log sheet also reflects that, sometime between 5:25 p.m. and 5:45 p.m., Stephens was removed from the holding cell to be interviewed. (*Id.*; Tr. 12)

### A. The agents' version of the time line of Stephen's interview

#### 1. *Agent Weigman*

After arriving at the Detroit/Windsor Tunnel, and receiving a briefing from a CBP officer, DHS Agents Scott Weigman and Brian Helmerson conducted an interview of Stephens. (Tr. 11-12) Weigman took the lead role in questioning Stephens. (Tr. 103, 125)  Consistent with the CBP's log sheet, Weigman recalled removing Stephens from the holding cell "sometime after 5:00 p.m." (Tr. 12), and testified that he began his interview by asking Stephens a series of biographical questions for about 20 minutes. (Tr. 34)  The biographical questions were taken from DEA Form 202 ("Personal History Report"). (Tr. 15, Dkt. No. 25, Ex. D (SS 22))  Stephens was not given a copy of the form.  Instead, Weigman solicited the information from Stephens and he completed the form. (Tr.15)  Stephens was asked: her name, date of birth, alias name, social security number, place of birth, citizenship, height, weight, address, identifying characteristics, occupation, employer name and location, and the name and address of her father, mother and boyfriend.  Agent Weigman also obtained Stephens' passport information.  Weigman testified that he did not advise Stephens of her *Miranda* rights until after he had obtained the biographical information. (Tr. 16) Before mirandizing

Stephens, Weigman also sought consent to search her cellular phone[2] (Tr. 59) and asked her a question along the lines of "what were you going to do when you got to the U.S.?" (Tr. 60)

Weigman testified that, following these questions, he advised Stephens of her *Miranda* rights at approximately 6:00 p.m. (Tr. 19)  He also gave Stephens a "Statement of Rights" form, which Stephens signed indicating that her rights had been read to her and that she fully understood them. (Dkt. No. 25, Ex. E)  Stephens refused to sign the portion of the form waiving her rights and agreeing to make a statement.  *Id.*  However, Weigman testified that Stephens, nevertheless, voluntarily agreed to answer his questions and recalled that the post *Miranda* questioning lasted for 15-20 minutes – for a total interview time of about 35-40 minutes.  (Tr. 23)

### 2. Agent Helmerson

Agent Helmerson's role in Stephen's interview was to provide support to Agent Weigman and take notes, although he did ask a few questions. (Tr. 23, 103)  Helmerson's notes are reflected, in chronological order, on SS 26, 27, 25 and 24 (Dkt. No. 25, Ex. C)  Helmerson testified that he and Weigman began talking to Stephens between about 5:00 p.m. and 5:30 p.m. (Tr. 121)  Like Weigman, Helmerson recalled that the session began with approximately 15 minutes of biographical questions (Tr. 121), after which Stephens was advised of her *Miranda* rights and, then, interrogated. (Tr. 105) Viewed sequentially, Helmerson's notes also suggest that Stephens was mirandized at 6:00 p.m – *after* answering several biographical questions and telling agents that she was going to an address on Freud Street in Detroit and going to return the rental car – but *before* being otherwise

---

[2]  According to Helmerson's notes, Stephens was asked for consent to search her cell phone at 5:49 p.m. (Tr. 59)  The agents later determined that the phone had a security code activated, and asked Stephens to supply the code.  (Tr. 114)  Helmerson testified that the request for the code was made after giving Stephens her Miranda rights.  (Tr. 114)  Stephens disagrees.

interrogated.[3] (Dkt. No. 25, Ex. C (SS 26, 27))  Helmerson estimated that the entire length of questioning was between an hour and an hour-and-a-half. (Tr. 93)

Both Agents Weigman and Helmerson also testified that at no time during interview did Stephens refuse to answer their questions, otherwise indicate she wished to remain silent (Tr. 23, 121-2) or request an attorney.  (Tr. 22, 109)  The agents claim that, during their interview, Stephens was never told she was *not* under arrest.  (Tr. 122)  It is also undisputed that Stephens was not denied food, water, use of a restroom or handcuffed. (Tr. 24, 93, 108)

### B.  Stephens version of events

Even before being questioned on June 29, 2010, Stephens admits to being aware of her *Miranda* rights because of at least one prior drug arrest.  (Tr. 149-50)  At the time of questioning by the DHS agents, Stephens was 31 years old, a high school graduate and had completed training at Georgia Medical College (a medical assistant training institution) with "straight A's." (Tr. 143-44)

Stephens' recollection of the timing, sequence and substance of events is quite different from that of the agents.  Stephens testified that Agents Weigman and Helmerson removed her from the holding cell and began questioning her at about 3:45 p.m. (Tr. 134) – prior to the time the agents claim they even arrived at the border (at 4:30 p.m. to 4:40 p.m). (Tr. 33)[4] Stephens further recalled that the interrogation *concluded* with Weigman providing her *Miranda* rights – after she had answered all of their questions.  (Tr. 173)  Stephens *does* agree that she was mirandized at 6:00 p.m.

---

[3] At this point in the analysis, the undersigned is excluding consideration of the single question: "What were you going to do when you entered the U.S.?" *See*, Section III(B), *infra*.

[4] As discussed in greater detail below, Stephens' testimony is also inconsistent with the CBP log, which indicates that she was placed in the holding cell at 4:26 p.m. and remained in her cell – without leaving – until between 5:25 p.m. and 5:45 p.m. (Dkt. 25, Ex. B)

but, again, insists that the rights were given after the agents' questioning ended. (Tr. 141) According to Stephens, the entire interview lasted about an hour to an hour and-a-half. (Tr. 141)

Stephens stated that, during the interview, Agents Weigman and Helmerson advised her that she was *not* under arrest (Tr. 137) and could leave and return to her children in Atlanta, Georgia as soon as she answered their questions. In particular, Stephens testified that "Weigman, he kept telling me that there was something found in the car. We're not saying it's yours but you just work with us and we will let you go." (Tr. 140) She also testified that she repeatedly requested a lawyer (Tr. 137), and refused to sign the waiver of rights form because the DHS agents did not honor her request for counsel. (Tr. 142) Stephens said that the agents told her that because she was not under arrest, she did not need a lawyer. (Tr. 139) For these reasons, Stephens believes her responses to the agents' questions were coerced. Consequently, she seeks suppression of her oral statement.

### III.  ANALYSIS

#### A.  The DHS agents' testimony was more credible than Stephens' testimony

As it relates to the determination of suppression hearings, a district court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *United States v. Moon*, 513 F.3d 527, 536-37 (6th Cir. 2008). Where a defendant's motion to suppress is denied, the district court's factual findings are reviewed in the light most favorable to the government. *Id.* In this regard, the Sixth Circuit affords "great deference to the district court's credibility determinations[.]" *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

Here, Stephens and the DHS agents agree that she was mirandized at 6:00 p.m. The DHS agents claim, however, that they advised Stephens of her rights *before* starting the interrogation;

Stephens insists that it occurred *after* the interrogation ended.  Stephens' version of events is not credible and is inconsistent with the holding cell log sheet maintained by CBP.

The undersigned finds the log sheet a particularly reliable document because it was prepared by CBP officers – independent of DHS Agents Weigman and Helmerson.[5]  Further, the critical entries on the log sheet were made before the DHS agents questioned Stephens and, thus, before, anyone could have anticipated a purported issue regarding the timing of Stephens' subsequent advise of rights and interrogation.  The log sheet, itself, contains the following directive:

> This log sheet will be used when a person is left **unattended** in a secure area.  Observation entries will be made every 15 minutes to ensure the safety of the person.  If the person is removed from the secure area and taken to a different location within the CBP facility, (i.e., fingerprint room, interview room, etc.), it shall be annotated on the sheet.  After the person is released or transferred to another agency or facility, the Personal Detention Log Sheet will be retained on file locally, in chronological order, for two years and three months from the date of detention. (Emphasis in original) (Dkt. No. 25, Ex. B)

This demonstrates that the log sheet was not specifically created to note the periods of Stephens' detention but rather to document the 15-minute observations of all detainees – as part of an ongoing custodial record.  As such, the undersigned finds the log sheet is an important reference against which to compare the witnesses' testimony about the timing of events.

The log sheet indicates that Stephens was detained in the holding cell, without interruption, from 4:26 p.m. (Time In) until between 5:25 p.m. (when she was observed "sitting" in the cell) and 5:45 p.m. (when the entry indicates she was being interviewed).  Stephens testified that she was removed from the cell for her interview at about 3:45 p.m.  But, this would have been before the log

_____

[5] While it appears that both DHS agents and CBP officers fall within the purview of the DHS, Agents Weigman and Helmerson were not involved in the completion of the log sheet.

sheet indicates she was even placed in the holding cell and before the agents testified they arrived at the border. Stephens also testified that she was interviewed *after* being removed from the holding cell by the DHS agents. Thus, her recollection of the time the interview began is at odds with the log sheet, and the testimony and notes of both DHS agents.

In contrast to Stephens' testimony, the DHS agents' testimony was far more consistent with the log sheet. Both DHS agents testified that Stephens was taken from her cell to be interviewed after 5:00 p.m. The log sheet places the time of the interview after 5:25 p.m. and before 5:45 p.m. With 15-20 minutes of biographical questioning occurring before the interrogation – as both agents testified – 6:00 p.m. is most likely the time Stephens' interrogation *began* not ended. Of course, it would be unreasonable to expect either side to precisely recall the timing of events that transpired almost a year earlier. Yet, the notations of time and sequence of Agent Helmerson's contemporaneously taken notes, and the hearing testimony of both agents, is far closer to the time reflected on the independently maintained log sheet than Stephens' time line of events. Accordingly, the undersigned deems the DHS agents' testimony more credible than that of Stephens and finds that: (1) the interview commenced sometime after 5:25 p.m.; (2) the interview began with a series of biographical questions; (3) with the exception of the single question discussed below and the DHS agents' request for consent to search Stephens' cell phone, Stephens was advised of her Miranda rights at 6:00 – *before* being interrogated; and (4) Stephens' responses to the post-*Miranda* interrogation were knowing and voluntary (i.e., not coerced as claimed by Stephens).

**B. Although a close call, Agent Weigman's question: "What were you going to do when you entered the U.S.?" was an impermissible investigative question requiring advance *Miranda* warnings**

Before the police may interrogate a suspect in custody, they must first read the *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *U.S. v. Pacheco-Lopez*, 531 F.3d 420, 423-424 (6th Cir. 2008). An "interrogation" comprises "not only [ ] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Miranda* warnings are not, however, required for questions "reasonably related to the police's administrative concerns [the booking exception]," such as the defendant's name, address, height, weight, eye color, date of birth and current address. *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993) ("ordinarily ... the routine gathering of biographical data for booking purposes should not constitute interrogation under *Miranda*"). "Where the booking exception does not apply to statements made before administration and voluntary waiver of *Miranda* rights, those statements are 'irrebuttably presumed involuntary' and must be suppressed." *Pacheco-Lopez*, 531 F.3d at 424.

In *Pacheco-Lopez*, the Sixth Circuit clarified the sometimes murky boundary between "questions relating to the processing of an arrest that are biographical and questions of an investigatory nature." *Id.* Lopez was detained by undercover officers, after being found inside a house during the execution of a search warrant relating to a large-scale cocaine trafficking investigation. *Id.* at 422. Several arrests related to the investigation (stemming from a "controlled buy" of 16 kilograms of cocaine) had been made the week before the execution of the search warrant. Upon entering the house, officers immediately handcuffed Lopez and placed him at the kitchen table for questioning. *Id.* Officer Slaughter asked Lopez his name and where he lived; Lopez responded

- 9 -

that he lived in Mexico and not at the search warrant location. Slaughter next asked Lopez when he arrived at the house and how he had gotten there. Lopez responded that he had driven from Mexico the previous Sunday in a white Ford pickup truck; he then volunteered the keys to the pickup. At that point, Lopez – who did not speak English – was advised of his *Miranda* rights in Spanish. Immediately thereafter, Slaughter asked Lopez whether he or another suspect had brought any cocaine to the residence. *Id*. Lopez acknowledged that he had transported cocaine. Lopez was then taken to a bedroom for further questioning, at which time Lopez indicated that he did not want to speak further with the investigators. No further questioning occurred. *Id*. at 423.

Lopez subsequently entered a guilty plea conditioned on the outcome of his motion to suppress the statements. *Id*. The district court judge held that held that the initial interaction (pre-*Miranda*) was not an "interrogation," "relatively innocuous" and only important with the benefit of "20/20 hindsight." *Id*. The judge, therefore, found that "the additional questions asked and answered after the *Miranda* warning [were] not subject to suppression under *Missouri v. Seibert*, 542 U.S. 600, 608-09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). The Sixth Circuit reversed.

The Sixth Circuit undertook an analysis of the "factual circumstances" of the questioning including what the officers knew at the time they questioned Lopez and the "susceptibility of the suspect" in determining whether the questioning would "be reasonably likely to elicit an incriminating response." *Pacheo-Lopez*, 531 F.3d at 424. The court reasoned that asking Lopez where he was from, how he had arrived at the house, and when he had arrived (knowing about the previous week's arrest) were questions "reasonably likely to elicit an incriminating response," thus mandating *Miranda* warnings. *Id*. The Court also found the fact that the questioning of Lopez did

- 10 -

not take place at a police station and the failure of officers to document Lopez' responses supported its conclusion that the booking exception did not apply. *Id*. at 424-25.

Although a close call, the undersigned finds that the question: "What were you going to do when you entered the U.S.?" went beyond the boundary of a biographical question, was investigatory in nature and was reasonably likely to elicit an incriminating response –  requiring advanced *Miranda* warnings.[6]  While it is true that Stephens was detained at the international border crossing between the United States and Canada (Detroit/Windsor Tunnel), where questions about a person's destination and activity within the United States are routinely and properly asked of prospective entrants, Agent Weigman's question does not appear anywhere on DEA Form 202 (Personal History Report).  This suggests that the information sought was not required biographical information. Additionally, at the time Stephens was asked this question, the DHS agents already knew that she was a citizen of the United States – making it unnecessary for them to know her plans once she entered the United States – at least for immigration or identification purposes.  More importantly, having been briefed by a CBP officer before Stephens' interview, the DHS agents also knew that a large quantity of ecstasy pills were recovered from Stephens' rental car.  Understanding Stephens' plans once she entered the United States were, thus, an important part of the investigation into whether Stephens was aware that her rental car contained illegal drugs.

True, Stephens was not a particularly susceptible suspect: She was English-speaking, had a post-high school education, and was familiar with her *Miranda* rights because of a prior drug related

---

[6] It cannot be reasonably argued that the following questions, taken directly from DEA Form 202, were not "booking questions": her name, date of birth, alias name, social security number, place of birth, citizenship, height, weight, address, identifying characteristics, occupation, employer name and location, and the name and address of her father, mother and boyfriend. *See Pennsylvania v. Muniz*, 496 U.S. at 601.

arrest. In addition, unlike in *Pacheco-Lopez*, Stephens' questioning *did* take place in a police station-like setting and the DHS agents "actively documented" her responses. *Id.* at 425. However, these circumstances are insufficient to cure an improper investigative question, and Stephens' answer: that she was going to an address on Freud Street and to return the rental car is "irrebuttably presumed involuntary" and must be suppressed.

### C. Suppression of Stephens' post-*Miranda* statements are not warranted

Once a determination has been made that a pre-*Miranda* statement should be suppressed, it must then be decided whether the post-*Miranda* statement should meet a similar fate. *Pacheco-Lopez*, 531 F.3d at 425. Cases in which a suspect is interrogated, given a *Miranda* warning and then interrogated again are referred to as "*Miranda*-in-the-middle interrogations." *Id.* Typically, these cases involve a suspect who is asked a *series* of questions before being mirandized and then re-interrogated after receiving a *Miranda* warning. In *Seibert*, for example, the suspect was purposefully interrogated without a *Miranda* warning for more than 30 minutes, given a 20 minute coffee break, mirandized, and then re-asked the same questions. Such two-step interrogation techniques (question first, warn later) that are "used in a calculated way to undermine the *Miranda* warning" mandate suppression of both the pre- and post-*Miranda* statements. *Seibert*, 540 U.S. at 622 (Kennedy, J., concurring).[7] This is not such a case.

Although the single (non-booking) question asked of Stephens has been deemed an improper investigative question, only Stephens' response to the question should be suppressed – not the

---

[7] Most circuits have treated Justice Kennedy's concurring opinion in *Seibert* as controlling precedent. *Pacheco-Lopez*, 531 F.3d 420, 427 n. 11 (6th Cir. 2008). However, even under the plurality opinion of four of the justices – which considers five factors to determine whether a *Miranda*-in-the-middle warning could be effective, the undersigned finds that the post-*Miranda* statement should not be suppressed. *Seibert*, 542 U.S. at 615.

subsequent post-*Miranda* questions.  DHS agents did not engage in an effort to "undermine [the *Miranda* rule's] meaning and effect" by asking this single question – commonly asked of people seeking to enter the United States.  *Id*.  In particular, the undersigned finds that neither Agent Weigman nor Agent Helmerson engaged in a "deliberate strategy to violate *Miranda*."  *See Neal v. Booker*, No. 05-74000, 2009 WL 1508285, at *8 (E.D. Mich. May 29, 2009) (finding "no evidence in the record of a deliberate strategy to undermine or flout *Miranda* where the questioning deputy did not think he had to give the suspect a *Miranda* warning until the "focus of the interview turned to the details of the homicide").  As such, the post-*Miranda* statements are not subject to suppression as long as they were knowingly and voluntarily made.  *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).  The undersigned finds that they were.

### C.  The post-Miranda statements were knowingly and voluntarily made

The government has the burden of proving by a preponderance of the evidence that the waiver was voluntary; however, in order for the waiver to be involuntary, there must be "an element of police coercion." *Seymour v. Walker*, 224 F.3d 542, 554 (6th Cir. 2000) (citing *Colorado v. Connelly*, 479 U.S. 157, 169-71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)).  "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

Stephens claims that the DHS agents told her she was *not* under arrest; that she could leave and see her daughter after answering the agents' questions and that she did not need a lawyer. Therefore, she feels that her statement was coerced.  However, as discussed earlier, the undersigned

finds that, with the exception of the one question discussed above, Stephens *was* mirandized *before* being interrogated.  Each of the *Miranda* rights were read to Stephens (Dkt. No. 25, Ex. E), and the undersigned finds that she was sufficiently intelligent to understand and waive those rights. Stephens –  who had been arrested before –  knew that she was not required to answer the agents' questions and could demand a lawyer.[8]  In sum, the undersigned finds the agents' testimony, that Stephens later knowingly and voluntarily answered their questions, credible, and this finding is not disturbed by the fact that Stephens' refused to sign the "waiver" portion of the form, or the fact that the DHS agents requested consent to search her phone before providing *Miranda* warnings.  *See U.S. v. Reynolds*, 496 F.2d 158, 162 (6th Cir. 1974) (under the circumstances, suspect's statement was freely and voluntarily given despite the fact that defendant refused to sign the waiver of rights form); *see also U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985) ("[r]outine searches of the persons and effects of entrants [into the United States at the border] are not subject to any requirement of reasonable suspicion, probable cause, or warrant); *U.S. v. Ward*, No. 09-3192, 400 Fed.Appx. 991, 2010 WL 4861738 (6th Cir. Dec. 1, 2010) (failure to give *Miranda* warning did not render consent to search involuntary).

## IV.  CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that Stephens' motion to suppress (Dkt. No. 10) be **DENIED**, *except for* Stephens' response to the one question regarding what she

---

[8]  The undersigned simply does not believe Stephens' testimony that she made such a request but the agents ignored it.  Stephens' testimony about the timing of her interrogation and the notification of her rights appears so blatantly contrived that the undersigned similarly rejects her testimony insisting that she demanded counsel as not credible.

- 14 -

was going to do when she entered the United States (i.e., that she was going to Freud Street and to return the rental car).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon _____
Mark A. Randon
United States Magistrate Judge

Dated: June 13, 2011

### CERTIFICATE OF SERVICE

*I hereby certify that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 13, 2011.*

s/Melody R. Miles _____
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*

- 15 -